The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Morning, sir. Morning. Mr. Davidson, you may proceed. Thank you, Your Honor. Good morning, Your Honors. I'm John Davidson here for the defendant, Mr. Seigler. Your Honors, the agreement of criminal minds to work together for a common criminal purpose is the essential evil at which the crime of conspiracy is directed. Conspiracy is different and often seen as worse than the act of committing the underlying crime. So in this case, Mr. Seigler was not charged with selling some methamphetamine on one day, March 9, 2016, in Nevada to Steven Sino. He was charged instead with conspiring, with agreeing with a bunch of people to distribute drugs in Southwest Virginia. So let me start at the outset with what I'm not saying because I didn't want to get to the heart of the particular evidence in this case pretty quickly. So, Your Honors, we're not here in a civil case looking at a district judge's granting of a Rule 56 summary judgment motion and asking if maybe there was a scintilla or more of evidence supporting the non-moving party. We're here in a criminal case with a man who's been locked up for more than 20 years or will be locked up for more than 20 years. So the question isn't today whether there's a little evidence to support conspiracy. The issue instead is whether there's substantial evidence, evidence that a reasonable jury could accept as proof beyond a reasonable doubt. Our argument, of course, today is that there's not substantial evidence of an agreement to distribute drugs to others. And then we would certainly add on to it. Let's not forget there's virtually no evidence of an agreement, a conspiracy to use a communication facility in furtherance of a felony drug offense. Now, why do I say that as to the facts in the law? I'll start with the law briefly and get right into the facts. On the law, as I said in the briefs, Your Honors, I think the Seventh Circuit in the Long case, the Eleventh Circuit in the Deckel case, the Ninth Circuit in the Lapeer case, all had it right. There must be an agreement in addition to the underlying purchase agreement that the buyer will be reselling the drugs to others. Large quantity sales alone, let alone one large quantity sale, does not distinguish a conspiracy from an ordinary buyer-seller relationship. The Seventh Circuit said if the evidence is equally consistent with either a buyer-seller relationship or a conspiratorial relationship to resell drugs to others, the jury wouldn't be able to conclude beyond a reasonable doubt that there was a conspiracy. So let me get in on the facts here. Ms. Hudson's a terrific lawyer and also a friend, and I would say that I want to respond to some of the hardest shots I think she gave me in her response brief because she was trying hard to say, no, there is enough evidence here. When I looked at it, the evidence of conspiracy here, I think ultimately, conspiracy agreement, ultimately amounted to the word deuce or maybe looks like it's going to be by Mr. Sino, a man who never testified at trial as to what he said, let alone what he meant. Deuce looks like it's going to be, is that maybe a scintilla? Is that a little something? Yeah, maybe, but it isn't substantial and it falls quite a bit short of what this court said in Hackley or where this court in Hackley was already plainly uncomfortable. What it said was the lower most limit of what it would accept as conspiracy to distribute drugs. Hackley, there was a whole lot more in Hackley. Mr. Hackley himself, the defendant himself, proclaimed people deal with him because he doesn't rat out others and that not telling on others was the whole principle of the game of drug dealing. Mr. Hackley tried to kill the witness against him, the witness who heard him talking about getting the drugs that he was going to sell to that suppliers in Maryland over a very long period of time. And we don't have any of this here. Now, I don't want to forget this, your honors. Again, we really just don't have any evidence of a conspiracy to use a communication facility to commit a felony drug offense, but let me stick with the conspiracy. Let me ask you, there is evidence here that before the transaction could confer with other individuals as to timing and amount, and they had at least two calls to that effect. So he knew there were other persons involved in making the transaction go. And if you accepted the evidence that the deuce was the two pounds of methamphetamine that were that say that the amount of drugs is a vital factor in determining a conspiracy conviction. Thank you, Judge Agee. It's always a challenge to inherit a case on an appeal, particularly where there's not a transcript of calls made. So I'm stuck with what I hear on audio. And I know that's the life of a judge. I understand that. But I would say, your honor, that I didn't hear Mr. Sino saying to Mr. Sigler, there was evidence that Mr. Sino was talking to others about having, you know, selling and whatnot. But what I think where Ms. Hudson hit me pretty hard, and understandably so, is she said, well, look, Mr. Sino called Mr. Sigler right after he was having these conversations with the people in Virginia. And what I would say is that may show what Mr. Sino's intentions and understandings were, but it doesn't say what Mr. Sigler's intentions and understandings were. You know, I may well tell a John Doe, or Mr. John Doe, that I'm going to go to my sandwich guy and go get him a sandwich. And then I may go to Jane Smith and buy a sandwich from her, and then you'll give that sandwich to I have conspired together to distribute a sandwich. We don't know what's going on in Jane's mind. Mr. Davis, I think your point is well taken in terms of response to that part of what Judge Agee was asking about, but not the point of this. Are you saying that you dispute that the record indicates that Mr. Sino indicated that other people had to be involved in the connections? You said it in a polite way, but are you saying that you read or you heard was in the record and you didn't hear what Judge Agee just said or anything? That's very important. What is your position on that? Are you saying there's no reference that Mr. Sino told your client that he had to confer, not who they were, but where were people in Virginia or other people that had an impact on when or how much he sold to him and what he sold to? Are you saying that doesn't exist in the record? It's very important. Your Honor, I know it's important, and the last thing I'd ever want to do is mislead the court as to the record. I listened again last night, and if it's there, I simply missed it again is the best answer I can give. And I didn't catch that in the response brief either, that there was a specific statement to Mr. Sigler, I'm conferring with people in Virginia or elsewhere to talk about these drugs. If it's in that record, I simply missed it. I told Ms. Hudson, David, to help us with that when she comes up. Go ahead with your argument. Go ahead. Let me just jump in if that's okay. And I think maybe this is where the issue lies. The evidence, as I understand it, was the statement that I think you referenced earlier. From what I understand, this thing is the next morning. I think the argument, and I guess the argument you're making is that you couldn't draw a reasonable inference from that, that he was conferring with other people in terms of the amount for distribution. No. Thank you, Judge Gallagher. Yeah, it looks like it's going to be. We're not saying that's no evidence. We're saying that's just too slender a read. That by itself without a whole lot else there, that's not enough to be substantial evidence. It's there. But when you compare that to what was piled up in Hackley, it's not as big as that. So for your honors to rule against my client in this case, I think you would have to say that the evidence in this case is at least the equal or the superior of Hackley. And when I look at the record in that case, as your honors wrote about it then, and the record is this in this case as I listen to it now, that's just not the case. And then the last thing I would like to touch on before I move on, there was the issue that he ran away. That is, he didn't appear for court and that he ran away at some point. And Ms. Hudson understandably points that out to me. I would like to point out though that, and I didn't cite this in my brief and I want to do it now, the Wong Son case, it's a Supreme Court case from 1963. It's 371 U.S. 471. There the Supreme Court told us that flight evidence has long been criticized as of dubious value. Even older Supreme Court case, Alberti versus the United States, 162 U.S. 499, says, you know, the reason why that running away evidence is so dubious as evidence of guilt is that sometimes people don't want to be falsely accused. Sometimes they may be fearful of, for another reason, like not wanting to have to go through a trial. So I don't think that is enough of a read to huge 22-year-old or 22-year sense on. Your honors, if I might move to the issue of the error with the jury instructions and the jury felony controlled substance offense. I believe that my friend Ms. Hudson correctly conceded that it was a plain error. She's not conceding that should be reversed on those grounds, but she conceded that there was a plain error that the judge should have instructed and put in the jury verdict form that it was in relation to a felony drug offense, not just anyone. And so the issue comes down to, well, you know, does this make us, do we really hit that third thing where did this really affect his substantial rights? And I thought about that, your honors, and I harken back to in 1996 when I was clerking for a district judge and I thought about it and I thought, you know, one less conviction, one less object of a conspiracy and the district judge may well have given him less time. Plenty of district judges do add up all the crimes committed. There are plenty of district judges who don't give an air quotes freebie and I don't mean to be cavalier when I say that, but don't give a freebie in terms of crimes committed. So to say that, you know, that no way it's improbable that this district judge cared when fashioning the sentence here that someone committed the additional crime of conspiring to use Mr. Davidson. Mr. Davidson, are you making a sentencing argument now? Because I'm not remembering that from any of the briefing. I thought your argument went to the verdict form itself, but it sounds more like a sentencing argument now. Yeah, your honor, what I'm trying to do is deal with the issue of plain error. The jury instructions, the erroneous jury instructions and jury verdict form weren't objected to. So even if the error was plain, I have to do one other thing to get your honors to rule for me or my client, which is to show that in addition to being a plain error, that it affected his substantial rights. What Ms. Hudson said in response saying, no, it was a plain error, but your honor shouldn't reverse what she said was, well, it wouldn't have made a difference on the sentencing guidelines anyway. So there's really no substantial impact on Mr. Sigler. You don't need to notice this plain error. And I'm saying in response that you actually should, because it may well be this district judge would have sentenced him less if this crime disappeared on us. This judge already engaged in a variance below the sentencing guidelines, so he may well have done that. I understand your argument, but have you made that before today? Uh, no, I'm responding to her response brief, your honor. I didn't, I was saying early, immediately in my merits brief, I was saying this does in fact impact his substantial rights. And I'm now replying to Ms. Hudson's very good response to me, best I can do with that. And then your honors, before I leave this point, I quoted from the Supreme Court's 2018 plain error which I think is the freshest one we have. It's the Rosales-Morales case. And there they talked about, you know, in addition, when circling out whether they want to notice a plain error, you know, they, they really ought to look at, you know, this plain error, is that going to affect the public reputation of the judicial proceedings, the integrity of them, something like that. And, and here I would certainly say, just looking at this, it would be awfully hard just me as a to, to really anybody and say that, yes, the jury did not make a finding on an essential element because the judge didn't instruct them on it. And that still doesn't matter. We're just going to let that go. And so I, I simply add that for, for what it's worth. So your honors, if I might move now to the issues with the jury verdict form, and it's one of the rare occasions where if we were in person, I would, I would pick it up, give it to you again, because the, the spacing, the visual of it, the way the jury experienced it actually does matter. Your honors know it's at 432 and 433. I think, you know, Ms. Hudson did a fabulous job of pushing back what I was saying, and I tried to push back in my reply. If we look at it, I, I, I think, I, I, I would hope anyway that your honors, when writing your opinion, and really in this case, would not say this is a, this is a verdict form that we ought to keep using. This is a good verdict. I don't think it's a good verdict form. I laid it out in my brief, the initial question of and or that and or just really shouldn't be there. And so when you, when you write your opinion, I hope you will join with the other courts who say, you know, trial judges, let's, let's get the end or out jury instructions, jury verdict forms entirely. Because it, it does enable them to look at that and say, all right, do we unanimously find that he was guilty of object one and or object two? Yes, that can happen if nine people agree on one, nine people agree on the other, but no 12 agree on any one of them. Now I know the response, and it's a good response. Is your argument that the, the instruction we, the jury unanimously find doesn't apply to the specific verdict on the two particular charge defenses? What's at the bottom of page 432? Your honor, may I answer your question? I'm way beyond time and I apologize. May I go ahead? Yes, you may answer. Yes. Okay. Yeah, your, your honor. The answer is yes, sir. We stand by what we say in our reply brief that when you look at the second question, we don't have a, we, the jury unanimously find there. And in fact, it goes from first person to second person. So if you did try to read it together, it's already quite awkward. We, the jury unanimously find, if you did try to read it together, it's already quite awkward. So that itself pulls them apart. And again, it was, it was, it was quite ambiguous. Thank you for the extra time. I appreciate it. Thank you. All right. Ms. Hudson. Hi, good morning. Ms. Hudson, let me get right to it. You know, we come on, you know, I know conspiracy in the fourth circuit and the laws, and you don't have to know everybody in the conspiracy. We know that, but aren't we going a bit far now where no one in the conspiracy even testified and we are grappling with the records and try to piece together maybe a sentence or words to say there's any knowledge. I mean, it's understood that he sold drugs to Sino. Yes. I mean, I think that's, I think counsel and read that, but a conspiracy Sino didn't even testify. So can you tell me how beyond a reasonable doubt is a conspiracy proven here? Yes, Your Honor. I'll be happy to do that. First of all, we did, before I get to Mr. Sino, Bradley Chapman did testify as the government's first or one of the first witnesses. And he certainly established through his testimony, the participants and pattern of the organization as it existed in Southwest Virginia, explaining to the jury about Richard Cayenne and Tracy Callahan and Mr. Sino, their sub distributors, the fact that they were getting the drugs in from Los Angeles, I mean, Las Vegas and the money going from Southwest Virginia back to Sino, Cayenne and other people in Las Vegas. So we did have that testimony at the trial. You proved that a conspiracy existed. The question is, did you prove that he was a part and we did, and of course the court knows, and we've had some discussion now already about the telephone calls that were central to the government's case that preceded the discovery of the two pounds of methamphetamine in Mr. Sino's car, which came directly from Mr. Siegler's house. I'd like to focus on the second of those telephone calls in order to answer the court's question, Your Honor. And in that second phone call, we've had some discussion today about one portion of the call, which is important and establishes very clearly when Sino is talking to Siegler, that Sino is negotiating on behalf of a third party, that Mr. Sino is a middleman and therefore that there are other people involved in that conspiracy. His words were to Mr. Siegler, from what I understand, it looks like it's going to be a deuce. He's clearly talking about what he understands from someone else. And that's not all. He goes on, Siegler says, okay. What's going to be a deuce? The, whatever deal that they are talking about, the deal that is, what I understand from what I understand, from what I understand, it looks like there's two keys. From what I understand, I'm going to buy two keys of meth from you. That's a conspiracy. That simply could mean easily that, okay, from what I understand, based on who I'm going to be selling drugs to, I'm going to need a two from you. How is that a conspiracy? How is that that, Mr. Siegler knows that he's a part of the conspiracy, just saying, I got to find out how many customers I have. So Mason right now, I think I need a deuce. So what? How does that prove that he's a conspiracy? Well, there's more. That phone call goes on. Siegler says, okay. And Mr. Sino says, and I would just put a caveat here. This is, I'm sure not absolutely exact, but it's as close as I could get from listening to the, to the tape. Sino says, in a case like this, he spent all this money. Why didn't you get it transcribed? I, I'm sorry. I don't know. I don't know if it was because the tapes were very clear or the phone calls were short. I don't know, but for whatever reason, they were not transcribed. But anyway, Mr. Sino says, but I will know for sure. In other words, following from what I it looks like it's going to be a deuce. Then Siegler says, okay. Then Sino says, but I will know for sure. As soon as I get to the girl's house in the morning, when he or it, I couldn't hear exactly what that word was, gets there. Then Sino continues and said, that'd be cool. Right? So a few hours, if I know by nine 30, like like by nine 30, maybe we can have lunch at 12, maybe. Siegler says, and this is critical. Yeah. Well, we can do that. I'm going to call him right now and make sure everything's something. I can't hear the word that follows everything's and I'll set it up for today. Those are Siegler's words. I'm going to call him right now and make sure everything's something and I'll set it up for today. Then Sino responds and says, you know, always like to make sure that I've got what I've got coming, you know, have it in hand for sure. I don't ever want to put you out or make you do something for nothing. Siegler says, yeah, definitely. And then Sino reiterates again, but I'll know for sure by nine 30, 10 at the latest tomorrow. And then, okay. I'll talk to you then. So that's, that is it for that second phone call on March the 8th. And then of course we know in the morning, there is another conversation between Sino and Tracy Callahan, where they confirmed that it is going to be two pounds. Sino wants $20,020. And they talk about whether it's going to be the same place. And Callahan said, yeah, where you always do this deal. And then Siegler, sorry, then the next phone call, the last of the four phone calls, the one on March the 9th between Siegler and Sino is a very short and sweet, I would say, phone call where Sino says somewhere into the conversation, what time is going to be good for you? Siegler says, I'm ready whenever you are. Sino says, okay, you're all set then. Siegler says, yeah. Sino says, all right, give me 40, 45 minutes. And they have a discussion about lunch and the lodge. And as we know, then the physical surveillance corroborates that in fact, Sino is seen at the lodge, picking up what appears to be food and going into Siegler's house. So from the government's perspective, those phone calls leave no doubt that Siegler understood that Sino was negotiating on behalf of a third party, that Sino was talking to other people, that Sino wanted two pounds of methamphetamine for him, that he wanted approximately $20,000 in payment for those two pounds of methamphetamine. And what is clear from Siegler's response in the second March 8th call, is that Siegler says on that call, he's going to call his guy and get the deal set up for today for his part of it. So I think that's critical to this conversation as well. So the government's view is that is absolutely- So you're proving two separate conspiracies. Another one now, you said, whoever that was, he was going to talk to, that's a conspiracy too? I'm just saying that the fact that another person is clearly involved in the chain now with Siegler's mentioned that he is going to call him right now, and he's going to set it up for today. It's clear that the conspiracy involves the Southwest Virginia people, in particular here, Tracy Callahan, Mr. Sino in Las Vegas, Siegler in Las Vegas. But Mr. Hudson, you jump into it. All of this stuff you talked about after Sino talking to what's going on in Virginia, there's no proof that Mr. Siegler's anything about that. Whatever it meant, like, okay, right now is a deuce. Well, that simply means that, I mean, Sino cleared up the quandary as to how much I'm going to buy from you and people in Virginia. But what would happen to it? This seems like just a classic drug sale. If you would say this, then you can prove this simply because, okay, you sell drugs, then that means you must have gotten them from someplace else, because unless you got your own coca leaves, I guess you does. Every drug purchase would be a conspiracy. They say, well, that must have come from there and somebody in South America must have mentioned it. No. And then the other part is just as bad because the buyer says, right now I want two keys from you, but I got to clear up how much I want from you. And they go up with other people and clear up how much they need. That means you're involved in a conspiracy in Virginia with Sino and his people. I mean, it seems to be nothing more than a drug purchase. I think the government had to prove that the conspiracy existed in the Western District of Virginia. I think the government had to prove that Mr. Siegler had a meeting of the minds with at least one other conspirator in this case with a purpose to set forth in the indictment to distribute methamphetamine. And I think the telephone calls that we've introduced corroborated by the physical surveillance and the physical seizure of the actual two pounds of methamphetamine establishes that clearly. It might not be the most voluminous evidence, but the government would argue that the evidence we have spoke loudly and strongly and was absolutely sufficient to sustain the jury's verdict in this case under this court's precedence, which clearly state that a buyer-seller transaction in conjunction with a substantial quantity of drugs is sufficient to support the inference that there was a conspiratorial relationship between the two people. And here, where there is a $20,000 methamphetamine deal for two pounds of methamphetamine, we think we've met both of those marks, Your Honor. So on that, we believe we should prevail on the sufficiency argument. Regarding the verdict form, on the unanimity question, the government's position is clear. I think from the briefs, but I'll just reiterate here that first, the plain language of the form obviously states we, the jury, unanimously find as follows with a colon. And our argument is that the face of the form reflects that everything that follows, in fact, was unanimous. But perhaps even more importantly, the court's instructions on multiple, in multiple places in the instructions, told the jury that their findings must be unanimous. The court then the first question, their finding had to be unanimous. And regarding the objects of the conspiracy, their findings had to be unanimous. The court said in particular, although you must unanimously agree that the conspiracy had at least one of these alleged objects, you must unanimously agree as to which objects the government proved beyond a reasonable doubt. So again, under this court's... Ms. Hudson, where were you reading in the read? I was reading the court's instructions at JA406 regarding the particular, I would say the two questions on the form, and in particular, the objects, the unanimity instruction on the objects of the conspiracy. But also at JA396, the court told the jury that they must make unanimous findings in this case generally. So in our view, there can be no doubt when the unanimity is viewed in the context of the court's instructions. Collectively, there is no doubt that each of these jury's findings was unanimous. The instruction regarding the 843B object, as Mr. Davidson pointed out, we agreed in the brief that it appears the court had made an error because clearly the statute does require a felony drug offense. But as we argued in our brief, it is just stretches beyond any reason in our view to consider that this jury might have made a finding based on marijuana, where the evidence in this case was absolutely about methamphetamine. And clearly regarding Mr. Siegler, even more particularly about the events of March 8th and 9th, as evidenced by the telephone calls, physical surveillance, and the vehicle stop on March the 9th, it is just, I would argue, almost impossible to think that the jury would have made some finding based on marijuana in this case. The court instructed the jury that methamphetamine and oxycodone, in particular, the two substances alleged in the indictment, were controlled substances. And again, the evidence in this case was not about marijuana. It was not it was just not the case. It was a methamphetamine case. And where the jury also knew that a controlled substance is a felony? The court did not instruct the jury that a controlled any particular offense was a felony. He instructed them that methamphetamine was a controlled substance and that oxycodone was a controlled substance. But I don't believe the court specifically told the jury that any particular controlled substances of offense was a felony. Of course, I would point out that I don't think the jury would ever be asked to find whether a particular offense was a felony. I think if the court had said anything about the felony offense, it would be more likely that the court would have, just as he did instruct them that these particular substances were controlled substances, that it would have been more likely he would have instructed them as a matter of law that, for example, distribution of methamphetamine is a felony and so forth. But I don't think that particular instruction was there. Our argument is that on the evidence of this case, and particularly in light of the jury's specific finding, not only that Mr. Siegler committed both objects to the conspiracy, but that methamphetamine was the substance and that it was more than 500 grams of methamphetamine, that there was no question here that the jury was confused about whether or not marijuana was the subject of this case. I'm trying to think if I have... I want to make sure, since you're hesitating there, you know, it's dangerous to hesitate in front of appellate judges. We'll ask you a question. You know, but are you basically saying that buyer-seller, just by the amount alone, would be enough? That because there's a high amount of drugs and money, that would be enough to prove Beata Reid's book out as conspiracy? Is that what you're saying the law is in full circle? Yes, Your Honor. And more particularly, I'm saying that evidence, as this court said in Mills and Reid and Yearwood, evidence of a buy-sell transaction coupled with a substantial quantity of drugs would support a reasonable inference that the parties were co-conspirators. And by way of example... A reasonable inference. A reasonable inference. What's the standard here? Beata Reid's book out, isn't it? Yes, Your Honor. Okay, go ahead. And I wanted to simply point out by way of an example in response to the court's question about the quantity of drugs that in the Yearwood case, the amount of drugs involved in that case was five ounces of cocaine base for $3,500. So our view is that in light of those precedents, a $20,000 two-pound methamphetamine deal would be viewed as substantial and sufficient to support that inference. In those cases you cite, did someone testify in those cases? Because this is a case that's kind of unique. Nobody testified in this case at all, at all, even about the drug offense. Well, I would argue... I'm sorry. You're right. Somebody did talk voluminously on what happened going on in Virginia. You're right. But in terms of conspiracy that occurred, alleged as to Siegler, I mean, nobody even... Seno didn't say anything. I mean, he didn't testify. I suppose you got his evidence in because you got in through proving a separate conspiracy, how you got the hearsay in? Well, what I would say is that regarding Mr. Siegler, I was going to say is that although Mr. Seno didn't testify, and it would have been certainly interesting from the government's view to have had his testimony in the record. But in response to the court's question, I think I would say that we had the recorded voices in the telephone calls of Mr. Seno and Mr. Siegler through those telephone calls. So the government's evidence had their actual words. They are at best cryptic. Whatever happened to the rule of lineage in law? I mean, it doesn't exist anymore. Okay. All right. Well, he said deuce. That means it had to have been two. And he says, because he said deuce, that means he must have been conspiring with somebody else to tell him how much it was. All of this comes from... It's amazing. Well, I would argue, Your Honor, though, that look, taking that one statement of Mr. Seno's, he understood it to be deuce, out of context is one thing. But when you put it in the context where Mr. Siegler delivered two pounds of methamphetamine to Mr. Seno the very following day, consistently with their telephone conversations, I think we've certainly gotten over the line in this case. But that's the... No, it's consistent with you sold him drugs. Exactly. I agree with that. I'm not sticking my head in the sand on that. Yeah. Once I decide how much I want, yeah, I'm buying drugs from you. That was understood. And the quantity of drugs here, we're arguing, is so significant that it was clear to Mr. Siegler, based on this, that there was a conspiratorial activity here where Seno is negotiating as a middleman on behalf of third parties in addition to the substantial quantity of drugs. So... Honestly, honestly. Go ahead. If there are any further questions, I'll be happy to answer those. Otherwise, we'd rely on our briefs. Thank you. Okay. Thank you, Ms. Hudson. Mr. Davidson, you have some time reserved. Thank you, Your Honor. Sorry, I was on mute briefly. Your Honor, if I may pick up where Ms. Hudson just left off. I wanted to write by Judge Agee's because I never, ever want to misstate a record to an appellate court for any reason whatsoever. I would simply say, as best I could today, I don't have a transcript and that has been a little difficult. But having listened to those recordings a few times, I would describe them. I'm an advocate and I know that, but I would describe them as ambiguous. I think cryptic is a good word. Certainly, I can live with the evidence of conspiracy maybe being slight or light, but we just don't have substantial evidence beyond a reasonable doubt here. I think the question before the court is whether you're going to set a new boundary. Hackley said, that's our lowest boundary. We won't go below Hackley. And I think this would go below Hackley. If you say that a buyer-seller agreement, especially one, not a series of big ones, but one on March 9th, is that is enough to be substantial evidence, not slight evidence, not some evidence, but substantial evidence beyond a reasonable doubt of conspiracy, you'll be driving a circuit split. I don't think it's been the law in the circuit that a buyer-seller agreement alone on one day of a substantial amount gets you a conspiracy and we're done. If so, then we really don't have a difference between conspiracy and the underlying drug sale anymore. They've essentially merged and then we just get into interesting discussions about why people make the indictment choices they do. What we have in this case, without Mr. Sino having testified, he was on the government's witness list, but they didn't call him to testify. I wasn't trial counsel. I don't know defense's perspective on that. They may have been caught unawares. I don't know. But what we do have in this trial, not from sentencing later, but in this trial that the jury heard is one day, one deal, and we simply say, that's just plain old not, you know. I would answer any other questions and if there aren't others, I want to take the opportunity to thank you, Judge Gallagher, Judge Agee, and Chief Judge Gregory for taking the time to listen. All right. Thank you. So, Ms. Hudson, are you still with us? I just want to let you know and say that, first of all, Mr. Davidson, we note that you're a proponent. I want to give a special thanks to you. The court appreciates lawyers like yourself who help us on these cases and take these cases very much. And Ms. Hudson, obviously, thank you for ably representing the United States. We can't come down and shake your hands in this virtual existence, but please know that our spirit and gratitude are nonetheless. Thank you so much. Be safe and stay well and thank you so much. Yes, sir. All right. We'll ask that we have a just a very, very brief adjournment of the court and we'll proceed. Thank you. Thank you. The court will take a brief recess.
judges: Roger L. Gregory, G. Steven Agee, Stephanie A. Gallagher